# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LINDA LANE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:14-cv-02304-MHH** |
| | } | |
| **DEPARTMENT OF DEFENSE,** | } | |
| **MISSILE DEFENSE AGENCY, Dr.** | } | |
| **Mark T. Esper, Secretary of** | } | |
| **Defense,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Lane contends that the Department of Defense Missile Defense Agency discriminated against her because she is disabled and retaliated against her after she reported acts of discrimination.[1]  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Secretary of Defense has asked the Court to enter judgment in the Department's favor on Ms. Lane's claims.  According to the Secretary, there is no genuine dispute of fact as to whether the Department of Defense Missile

---

[1] Ms. Lane asserts her claims against Dr. Mark T. Esper in his official capacity as Secretary of Defense.  *See* FED. R. CIV. P. 25(d) ("[W]hen a public officer who is a party … ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name ….  The court may order substitution at any time, but the absence of such an order does not affect the substitution."); (*see also* Doc. 1 (naming then-Secretary Chuck Hagel as defendant).  The Court takes judicial notice that Dr. Mark T. Esper is the current Secretary of Defense.  The Court asks the Clerk to please make this substitution on CM/ECF.

Defense Agency suspended and terminated Ms. Lane because of her disability or in retaliation for filing an EEO complaint. For the reasons set forth herein, the Court grants the Secretary's motion for summary judgment in part.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, the Court presents the evidence in the light most favorable to Ms. Lane.

## II. BACKGROUND

### Ms. Lane's Employment History with MDA and Ms. Lane's Reasonable Accommodations

Ms. Lane worked as a contract specialist for the Department of Defense Missile Defense Agency (MDA) at Redstone Arsenal in Huntsville, Alabama. (Doc. 68-1, p. 11, tp. 41; Doc. 68-1, p. 12, tp. 45). She was responsible for evaluating contractor proposals, negotiating the government's contract position, and preparing written documentation for contract files. (Doc. 74-8, p. 3).

In 2009, while working for MDA, Ms. Lane began suffering from severe anxiety and panic attacks. (Doc. 68-1, p. 28, tp. 108). Ms. Lane did not request a formal accommodation until November of 2012. (Doc. 74-9, pp. 1-6).

In October 2011, Ms. Lane's supervisors recorded her absence from a mandatory contract course. (Doc. 74-49, p. 1). After Ms. Lane missed the class, her second-level supervisor, Barnett Klehman, stated in an email to Ms. Lane's other MDA supervisors: "Either she is mentally ill (which I think is a definite possibility), or she is trying to manipulate the system." (Doc. 74-49, p. 1). Mr. Klehman added: "We need to start the official documentation trail; at this point there is no longer any reason to try to help this employee, and we need to be prepared for a long and arduous process leading to separation." (Doc. 74-49, p. 1).

Several months later, Mr. Klehman said to Ms. Lane, "Good luck on getting your next 10 years." (Doc. 74-26, p. 13, ¶ 14). Ms. Lane perceived Mr. Klehman's

comment as a direct threat to her employment with MDA. (Doc. 74-26, p. 13, ¶ 14). In June 2013, Masha Thornton replaced Mr. Klehman as Ms. Lane's second-level supervisor. (Doc. 68-17, p. 2).

Meanwhile, in March of 2012, Marie Hickox became Ms. Lane's first-level supervisor. (Doc. 68-1, p. 12, tp. 45). In September 2012, Ms. Hickox emailed Ms. Lane's other supervisors and requested a "Record-Discussion" about Ms. Lane. (Doc. 74-35, p. 1). Ms. Hickox stated that Ms. Lane "ha[d] performed satisfactorily" but was beginning "a downhill slide," and "[t]here is a concern that she is unstable." (Doc. 74-35, p. 1). Ms. Lane contends that Ms. Hickox encouraged her to leave MDA. (Doc. 74-12, p. 2).

On November 7, 2012, Ms. Lane requested a reasonable accommodation for her disabilities via a form prepared by her treating psychiatrist, Dr. Regina Doody. (Doc. 74-9, pp. 1-6). Dr. Doody diagnosed Ms. Lane with panic disorder, ADHD, and depression. (Doc. 74-9, p. 1). Dr. Doody reported that because of anxiety and panic attacks, Ms. Lane found it difficult to function in the office environment, perceived MDA as a hostile work environment, and desired the option to telecommute for her job and perform her work duties from home when necessary because of panic attacks and anxiety. (Doc. 74-9, p. 2). Dr. Doody reported that Ms. Lane "states she is intermittently incapacitated to leave home for work" because of anxiety and panic attacks. (Doc. 74-9, p. 5).

On November 27, 2012, Ms. Hickox and the MDA disability program manager, Denise Walker, granted Ms. Lane the accommodations of telework (Ms. Lane could request to work remotely when necessary), a flexitour (ability to work credit hours to accumulate leave), and modified requirements for requesting sick leave (Ms. Lane could call in sick at any time before 1:00 p.m.). (Doc. 74-13, p. 1). In a memorandum memorializing a meeting that she attended with Ms. Lane and Ms. Walker, Ms. Hickox wrote that Ms. Lane must be able to perform the essential functions of her position from home. (Doc. 74-13, p. 1).

Beginning in January 2013, Ms. Lane teleworked almost every day. (Doc. 74-10, p. 14, tp. 51). Ms. Lane reported to Redstone approximately once every two weeks to perform duties that required her to be in the office. (Doc. 74-10, p. 22). On January 18, 2013, Ms. Lane filed an EEO complaint. (Doc. 74-46, p. 5; Doc. 68-1, p. 15, tp. 56). Ms. Lane amended her complaint four times, and her complaint was investigated from September 17, 2013, to April 15, 2014. (Doc. 74-46, p. 5).

On April 26, 2013, Ms. Lane met with Ms. Hickox and Ms. Walker. (Doc. 74-10, p. 15, tpp. 54-55; Doc. 74-15, pp. 1-4). Ms. Lane informed them that telework worked for her and that she wanted to telework as much as possible. (Doc. 74-10, p. 15, tp. 55). In a memorandum memorializing the meeting, Ms. Hickox wrote that she had approved Ms. Lane's telework in January 2013 "with the understanding from [Ms. Lane] that it would be irregular and infrequent." (Doc. 74-15, p. 1). Ms.

Hickox and Ms. Walker informed Ms. Lane that MDA needed her to transition back into working at the office for the majority of her work schedule. (Doc. 74-15, p. 1). Accordingly, Ms. Lane came to the office one day the first week after the meeting, two days the second week, three days the third week, and then four days the fourth week. (Doc. 74-15, p. 1). Ms. Lane was supposed to work in the office full-time by June 10, 2013. (Doc. 75-15, p. 1).

On Friday, June 7, 2013, Ms. Lane submitted a note from Dr. Doody dated May 29, 2013, in which Dr. Doody stated, "I am the treating physician for [Ms. Lane]. I am requesting that Ms. Lane be allowed to work from home for the next eight weeks due to her complaint of experiencing some episodes of anxiety and panic attacks." (Doc. 74-16, p. 1). Ms. Lane also submitted a note from her chiropractor, Martin Bryant, D.C., in which Dr. Bryant stated, "I have recommended [Ms. Lane] not be required to lift more than 2 pounds" because of neck pain, back pain, and headaches. (Doc. 74-17, p. 1). Ms. Hickox denied Ms. Lane's request to telework for eight weeks. (Doc. 74-18, p. 1). In a memorandum provided to Ms. Lane, Ms. Hickox explained that she denied the request because she believed Ms. Lane's previously approved accommodations were sufficient, the May 29, 2013 note from Dr. Doody did not demonstrate a nexus between Ms. Lane's disability and the accommodation specifically requested, and the note did not describe the functional limitations that interfered with Ms. Lane's ability to perform her essential duties.

(Doc. 74-18, p. 1). Ms. Hickox approved Ms. Lane's request for a lifting restriction of two pounds. (Doc. 74-18, p. 1). Ms. Hickox and Ms. Walker did not confer with Ms. Lane before denying her request for eight weeks of telework. (Doc. 74-10, p. 16, tpp. 59-60).

On August 3, 2013, Ms. Lane reported to Ms. Hickox via email that Ms. Lane's ex-husband, David Lane, who worked at Redstone, stalked Ms. Lane in the parking lot. (Doc. 74-20, pp. 5-6). Ms. Hickox responded, "I will find out and let you know what, if anything, I can do about the incident." (Doc. 74-20, p. 5). Ms. Lane responded,

> I don't appreciate you asking me yesterday whether I was still taking my medication. I found that very offensive. . . . Due to this incident I am requesting to once again work from home and away from what I perceive as a hostile work environment.

(Doc. 74-20, p. 5). In another email, Ms. Lane stated, "I don't being [sic] asked by you whether I am taking my meds." (Doc. 74-20, p. 4). And in another email, Ms. Lane stated, "your first question to me was 'You haven't been taking your medication lately have you?' I find that very insulting." (Doc. 74-20, p. 3). Throughout these emails, Ms. Lane requested telework, advanced annual or sick leave under the FMLA, or administrative leave. (Doc. 74-20, pp. 3-5). Ms. Hickox explained to Ms. Lane the process for requesting FMLA leave and for documenting the stalking incident. (Doc. 74-20, pp. 2-3). Ms. Hickox informed Ms. Lane that Redstone security would investigate the stalking incident and provide an escort for

Ms. Lane to and from the parking lot.  (Doc. 74-20, p. 2).  Ms. Lane responded, "it's almost laughable that MDA will conduct a fruitful investigation" because, according to Ms. Lane, MDA previously had covered up misconduct against her, destroyed her career, accused her of imagining the stalking, and humiliated her.  (Doc. 74-20, p. 1).

After this email exchange, Ms. Lane submitted to Ms. Walker an FMLA form requesting telework and a doctor's note.  (Doc. 74-23, p. 1; Doc. 74-21; Doc. 74-22).  Ms. Hickox issued a memorandum denying Ms. Lane's request to telework.  (Doc. 74-23, p. 1).  Ms. Hickox wrote:

> I am not willing to grant this accommodation because I believe the previously approved accommodations are sufficient to reasonably accommodate your disability.  Certain parts of your duties require your presence in the office.  Further, based on the September 12, 2013 doctor's FMLA form your doctor did not recommend 100% telework; therefore I am not willing to approve you for 100% telework.

(Doc. 74-23, p. 1).  Ms. Hickox requested bi-weekly meetings with Ms. Lane "in order to review the situation and maintain an open line of communication."  (Doc. 74-23, p. 1).

On October 17, 2013, Ms. Lane learned that she and a fellow contracting officer, Glenda Heard, would be participating together in a contracting class required for Ms. Lane's position.  (Doc. 74-27, p. 6).  A year earlier, Ms. Lane had accused Ms. Heard of threatening to cut her.  (Doc. 74-4, p. 11, tpp. 142-43).  Ms. Lane asked Ms. Hickox if "there [was] any chance that [she] might be assigned at a later date"

and indicated that she would have a panic attack if she encountered Ms. Heard. (Doc. 74-27, pp. 5-6).[2]  Ms. Hickox denied the request.  (Doc. 74-27, p. 6).  Ms. Lane missed the class.  (Doc. 74-27, p. 5).

Ms. Lane submitted a note from Dr. Doody dated October 23, 2013.  (Doc. 74-24).  In the note, Dr. Doody stated that Ms. Lane reported experiencing post-traumatic stress symptoms and panic.  (Doc. 74-24, p. 1).  Dr. Doody requested that MDA permit Ms. Lane to telework "whenever possible until January 2, 2014." (Doc. 74-24, p. 1).  Ms. Lane submitted another note from Dr. Doody in which Dr. Doody requested that MDA permit Ms. Lane to telework until December 1, 2013. (Doc. 74-28, p. 1).  Ms. Hickox denied the requests because she believed the accommodations already provided were sufficient.  (Doc. 74-29, p. 1).

On December 16, 2013, Ms. Hickox proposed suspending Ms. Lane for three days for failure to follow directions to attend the contracting class.  (Doc. 74-30, p. 1).  In a memorandum of proposed suspension, Ms. Hickox stated that Ms. Lane

---

[2] In his reply brief, the Secretary asserts that "[n]owhere does the cited material say anything about a panic attack.  Lane's subsequent claim that Hickox and Thornton had 'knowledge that Plaintiff would have suffered a panic attack if she attended the class with Heard' is also false.  Lane presents no evidence of such 'knowledge.'"  (Doc. 77, p. 40) (internal citation omitted).  True, Ms. Lane did not produce evidence documenting *how* Ms. Hickox received notice that Ms. Lane would suffer a panic attack if required to attend the class.  But Ms. Hickox's October 21, 2013 email states:  "[Ms. Lane] chose not to go to the class because she has an issue with one of the individuals on the roll to attend the class.  She indicated that she will have a panic attack if she encounters this individual."  (Doc. 74-27, p. 5).  This email sufficiently demonstrates, for purposes of this summary judgment opinion, that Ms. Hickox was notified that Ms. Lane anticipated having a panic attack if forced to attend the class with Ms. Heard.

failed to attend the class required for her position and did not submit medical documentation to excuse her absence as instructed. (Doc. 74-30, p. 1). Ms. Hickox stated that Dr. Doody's note was insufficient because it did not reference Ms. Lane's failure to attend the class. (Doc. 74-30, p. 1). Ms. Thornton sustained the charges and suspended Ms. Lane from January 21 to January 23, 2014. (Doc. 74-40, p. 1).

### Leave in January and February 2014

At 8:04 a.m. on January 28, 2014, Ms. Lane sent Ms. Hickox an email explaining, "since it's snowing outside in Athens and Huntsville right now, I'm requesting telework today. I plan to finish my pre-class assignment on Bundling which requires a paper and power point presentation which is due on 3 February. Please advise your approval." (Doc. 74-31, p. 9). Ms. Hickox responded, "I have not been made aware of any road closures and the base is open as usual. Before I approve for this reason, please let me know if there are any announced road closures. Otherwise, you need to report to the office." (Doc. 74-31, p. 9). At 9:15 a.m., Ms. Lane responded, "[n]o road closures. Working from home will allow me to work on this assignment and hopefully complete it today. Please advise." (Doc. 74-31, p. 9). Ms. Hickox responded, "[s]ee previous email below," referring to her first response. (Doc. 74-31, p. 8). At 9:27 a.m., Ms. Lane responded, "I believe you approved me for telework on a situational basis and now [are] refusing this request. Please provide your rationale for disallowing this telework request." (Doc. 74-31, p. 8). Ms. Lane

10

questioned whether Ms. Hickox refused the telework request in retaliation for a prior EEO complaint that Ms. Lane filed against Ms. Hickox and Ms. Thornton. (Doc. 74-31, p. 8). Ms. Lane stated, "I'm requesting that I be allowed to work from home due to the hostile environment that I work in which is directly related to the ongoing anxiety I'm now coping with." (Doc. 74-31, p. 8). Ms. Hickox denied the request again because the MDA office was open, and the roads were clear. (Doc. 74-31, p. 8).

> At 11:15 a.m., in a message to Ms. Hickox, Ms. Lane stated,

> I don't think you understand. I'm just not able to come in. How you and Ms. Thornton have treated me is nothing more than retaliation. I'm asking you again to allow me to work from home. The stress is unreasonable for me to work in an environment that is so hostile."

(Doc. 74-31, p. 7). At 11:46 a.m., Ms. Lane sent Ms. Hickox another email:

> [Y]ou don't understand. . . . I am unable to come in . . . . It's just too much for me right now. I hope that you and Ms. Thornton are proud of [yourselves] taking advantage of a person that has anxiety and panic attacks. You both should be ashamed of your actions. Due to your denial for disallowing me to telework on a situational basis, which you previously approved, I am now requesting advanced sick leave.

(Doc. 74-31, p. 7). Ms. Lane had a panic attack and could not drive to work. (Doc. 74-26, p. 20, ¶ 44).

The next day, Ms. Hickox sent an email advising Ms. Lane to submit her leave request "in accordance with agency procedures . . . on a Form 35 . . . ." (Doc. 74-31, p. 6). Ms. Hickox stated that she would "consider a request for annual leave

from 8:00 a.m.-12:00 noon, and advanced sick leave from 1:00-4:00 p.m. for [January 28]." (Doc. 74-31, p. 6).

Ms. Lane requested advanced sick leave for January 29, 30, and 31, 2014, and did not report to work those days. (Doc. 74-31, pp. 4-6). Ms. Hickox instructed Ms. Lane to submit a doctor's note explaining that she was sick so that Ms. Hickox could approve sick leave for the afternoon of January 28 and all day January 29, 30, and 31. (Doc. 74-31, p. 4). MDA policy required employees to submit medical documentation for sick leave in excess of three days. (Doc. 74-31, pp. 3-4). Ms. Lane submitted a note from Dr. Doody explaining that Ms. Lane could not report to work from January 28 to January 31 because of panic attacks. (Doc. 74-32, p. 1). Ms. Hickox accordingly granted Ms. Lane sick leave for the afternoon of January 28 and all day January 29, 30, and 31. (Doc. 74-39, p. 1). Ms. Hickox marked Ms. Lane absent without leave (AWOL) for the morning of January 28 because Ms. Lane asked to telework on the morning of January 28 to finish her class assignment, not because she was sick, and Ms. Lane did not submit a request for annual leave for that morning. (Doc. 74-4, p. 1).

Ms. Lane requested advanced annual leave for Friday, February 7, 2014, so that she could visit her father in San Antonio, Texas. (Doc. 74-31, p. 2). Ms. Hickox verbally approved the leave and instructed Ms. Lane to submit a leave slip before February 7. (Doc. 74-4, p. 4; Doc. 74-26, p. 22, ¶ 48; Doc. 74-31, p. 2). MDA policy

required employees to submit requests for advanced annual leave before taking leave. (Doc. 74-4, pp. 4-5). Because Ms. Lane was scheduled to attend a Contracts 280 course (CON 280) at the Defense Acquisition University (DAU), a continuing education and certification program required for Ms. Lane's position, Ms. Hickox instructed Ms. Lane to also coordinate her absence with her DAU professor. (Doc. 74-4, p. 4; Doc. 74-31, p. 2). Ms. Lane coordinated her absence with her professor, but she did not submit a leave slip. (Doc. 74-2, p. 12; Doc. 74-4, p. 4). She submitted a leave slip when she returned to work after February 7. (Doc. 74-8, p. 6). According to Ms. Lane, Ms. Hickox had on prior occasions accepted leave slips after the days she (Ms. Lane) was absent. (Doc. 74-8, p. 6; Doc. 74-37, pp. 5-6).

Ms. Lane was scheduled to attend her CON 280 class on Monday, February 10, 2014. (Doc. 74-38, p. 1). Ms. Lane could not attend the class because on February 9 she had a panic attack when she learned that MDA would not remove her disciplinary records from her personnel file while her EEO complaint was pending. (Doc. 74-8, p. 6; Doc. 74-38, p. 2). Ms. Lane informed her professor on the morning of February 10 that she would miss class. (Doc. 74-38, p. 1). Ms. Lane did not request leave before she missed the class. (Doc. 74-2, p. 1). She did not submit a leave request after her absence, but the note from Dr. Doody that Ms. Lane submitted for her sick leave from January 28 to January 31, 2014 stated that Ms. Lane had a panic attack on February 10, 2014. (Doc. 74-32, p. 1).

On February 19, 2014, Ms. Hickox proposed suspending Ms. Lane for 14 days. (Doc. 74-39, p. 1). In a memorandum providing Ms. Lane notice of the proposed suspension, Ms. Hickox listed five charges as the basis for the proposed suspension: (1) disrespectful or discourteous conduct from the January 28, 2014 email in which Ms. Lane stated, "I hope you and Ms. Thornton are proud of [yourselves] taking advantage of a person that has anxiety and panic attacks. You both should be ashamed of your actions;" (2) AWOL for the morning of January 28, 2014; (3) failure to follow leave procedures for the morning of January 28, 2014; (4) failure to follow leave procedures on February 7, 2014; and (5) failure to follow leave procedures and AWOL on February 10, 2014. (Doc. 74-39, pp. 1-3). As discussed below, Ms. Thornton ultimately sustained the charges and suspended Ms. Lane for 14 days.

### MDA Removes Ms. Lane from Federal Service

On Friday, April 4, 2014, Ms. Lane attended the last day of her CON 280 course. (Doc. 74-8, p. 7). She completed her final exams, passed the class, returned to her office, and left for the day around 10:30 a.m. (Doc. 74-8, p. 7). Ms. Lane left early because she believed that attending the course was her only work duty that day. (Doc. 74-8, p. 7).

At 11:38 a.m. that day, Ms. Thornton notified Ms. Lane via email of a meeting scheduled at 1:15 p.m. so that Ms. Thornton could deliver the decision on Ms. Lane's

proposed suspension. (Doc. 74-42, p. 4). Ms. Lane did not see the email and did not attend the meeting. (Doc. 74-8, p. 7).

At 1:42 p.m. that day, after Ms. Lane missed the meeting, Ms. Thornton sent Ms. Lane an email notifying her that the meeting was rescheduled for April 7, 2014. (Doc. 74-42, p. 3). Initially, Ms. Thornton informed Ms. Lane that Ms. Lane's attorney could attend the meeting. (Doc. 74-42, p. 3). Ms. Lane then informed Ms. Thornton that Mr. Cooper, Ms. Lane's attorney, was not available on April 7. Ms. Lane asked to reschedule the meeting. (Doc. 74-42, p. 3). Ms. Thornton responded that she was mistaken when she said that Ms. Lane was entitled to representation at the meeting. (Doc. 74-42, p. 2). Ms. Thornton "confirmed with [the Directorate of Operations Human Resources] that [Ms. Lane] was not entitled to representation at the meeting" and informed Ms. Lane that the meeting would proceed as scheduled. (Doc. 74-42, p. 2). Ms. Lane then requested that Ms. Thornton deliver her decision on Ms. Lane's proposed suspension via email, and Ms. Thornton repeated that she would deliver the decision in person at the meeting on April 7, 2014. (Doc. 74-42, p. 2). Ms. Thornton had to deliver the decision in person because MDA security preferred to attend the meeting, physically obtain Ms. Lane's MDA badge and common access card, and escort her from the building. (Doc. 68-17, p. 7, ¶ 12).

At 8:29 a.m. on April 7, 2014, Ms. Lane sent Ms. Thornton this email message:

> On Friday April 4th, you came by my office with security guards in tow along with an EEO counselor, Ernesta Waters. After calling you on this same day I was informed that you wanted to set up a meeting to discuss my 14 day proposed suspension however I never received notice of any meeting. I believe your actions on the 4th sought to deliberately embarrass me and had fellow colleagues questioning me what was going on. As one employee stated, your actions were "gestapo like." As an SES I am quite surprised over your tactics since you readily have both General Counsel and MDA EEO's office at your disposal. Coupled with your decision to later rescind attorney representation I find that your actions are a continuation of a hostile work environment at MDA. Therefore, please forward your decision to me today and I will assume that my 14 day suspension is in effect. If you have further comment, please also copy my attorney on that discussion.

(Doc. 74-42, p. 1). According to Ms. Lane, a colleague in her office texted her that Ms. Thornton and three security guards showed up at Ms. Lane's office "acting all gestapo like" the afternoon of April 4. (Doc. 74-8, p. 7).

In the afternoon of April 7, 2014, Ms. Thornton sent Ms. Lane the decision on her proposed suspension via email. (Doc. 74-42, p. 1). Ms. Thornton sustained the five charges that Ms. Hickox levied against Ms. Lane and therefore suspended Ms. Lane from April 8 to April 21. (Doc. 68-49, pp. 1-6).

Ms. Lane did not report to work on Monday, April 7, 2014, because she understood from a phone conversation with Ms. Thornton on Friday, April 4 that she would be suspended for 14 days, and she therefore assumed that the suspension would begin on Monday, April 7. (Doc. 74-8, p. 7). Because Ms. Lane did not report to work and did not request leave, Ms. Hickox listed Ms. Lane as AWOL for April 7. (Doc. 74-44, p. 2).

On May 7, 2014, Ms. Hickox proposed removing Ms. Lane from federal service. (Doc. 74-44, p. 1). In a memorandum providing Ms. Lane notice of the proposed removal, Ms. Hickox listed six charges as the basis for the proposed removal: (1) AWOL on April 4, 2014, for leaving work early at approximately 10:30 a.m.; (2) failure to follow leave procedures on April 4, 2014, for leaving work early without requesting leave; (3) inappropriate conduct on April 4, 2014, for leaving work early on April 4, 2014, without requesting leave; (4) AWOL on April 7, 2014, for not reporting to work; (5) failure to attend a meeting as directed (the April 7, 2014 meeting at which Ms. Thornton intended to deliver her decision on Ms. Lane's proposed suspension); and (6) disrespectful and/or discourteous conduct for sending the 8:29 a.m., April 7, 2014 email. (Doc. 74-44, p. 2). Ms. Hickox then placed Ms. Lane on administrative leave. (Doc. 68-52, p. 1).

On June 6, 2014, Ms. Thornton sustained the six charges that Ms. Hickox levied against Ms. Lane. (Doc. 74-45, pp. 1-3). Ms. Thornton decided to remove Ms. Lane from federal service as of June 9, 2014. (Doc. 74-45, p. 1).

**Procedural Background**

On January 18, 2013, Ms. Lane filed her first complaint of discrimination against MDA with MDA's EEO office. Ms. Lane alleged discrimination on the basis of disability and gender and retaliation arising out of events not material to this motion for summary judgment. (Doc. 74-46, p. 5). MDA's director of equal

opportunity and diversity management issued a final agency decision finding that the record did not support Ms. Lane's claims. (Doc. 74-47, p. 1).

On July 14, 2014, Ms. Lane filed her second complaint of discrimination against MDA with MDA's EEO office. (Doc. 74-48, p. 1). Ms. Lane alleged that MDA subjected her to a hostile work environment based on gender, disability, and retaliation when MDA suspended and removed her. (Doc. 74-48, p. 1). Ms. Lane brought those claims in this Court by filing her complaint on November 28, 2014. (Doc. 1). Because Ms. Lane elected to pursue her claims in district court, MDA dismissed Ms. Lane's second EEO complaint. (Doc. 74-48, p. 3).

Ms. Lane's third amended complaint is the operative pleading in this matter. (Doc. 51). Ms. Lane asserts a disability discrimination claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and a retaliation claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq*. (Doc. 51, pp. 12-13). Ms. Lane contends that MDA suspended and removed her because of her disability. (Doc. 51, pp. 12-13). She also contends that MDA suspended and removed her in retaliation for filing her first EEO complaint. (Doc. 51, pp. 13-14). Ms. Lane requests declaratory and injunctive relief, reinstatement to her previous position, and an award of compensatory and punitive damages. (Doc. 51, p. 14).[3] The Secretary has

---

[3] The Secretary mentions that Ms. Lane's third amended complaint is somewhat confusing. The Secretary asks the Court to find that Ms. Lane has asserted two claims: a claim for disability discrimination under § 504 of the Rehabilitation Act and a Title VII claim for retaliation for

asked the Court to enter summary judgment in favor of the Department of Defense on Ms. Lane's claims. (Doc. 67). The Secretary also objects to some of Ms. Lane's summary judgment evidence. (Docs. 79, 83).

## III.  ANALYSIS

### The Secretary's Objection to Doc. 74-36

The Secretary has objected to Ms. Lane's evidentiary submission from Kara Hetrick found at Doc. 74-36. (Doc. 79, pp. 5-12). Doc. 74-36 contains a letter dated October 11, 2016, and a document labeled "Affidavit of Kara Hetrick." (Doc. 74-36). The letter is addressed "To Whom It May Concern." (Doc. 74-36, p. 1). The letter contains narrative facts concerning Ms. Hetrick's requests for leave and some of the events surrounding Ms. Lane's departure from MDA. A signature that purports to be Ms. Hetrick's appears at the bottom of both pages of the letter, but the letter is not sworn. (Doc. 74-36, pp. 1-2).

The "affidavit" is not sworn either. The "affidavit" begins:

State of Alabama
Madison County

Before me personally appeared Kara Hetrick who after being duly sworn did depose and say as follows:

---

complaints of gender and disability discrimination. (Doc. 69, pp. 57-58). The Court agrees with the Secretary's characterization of Ms. Lane's claims. In her brief, in discussing her Title VII claim, Ms. Lane interchanges the terms discrimination and retaliation. (*See, e.g.,* Doc. 73, p. 58). The Court evaluates Ms. Lane's Title VII claim only under a retaliation theory.

(Doc. 74-36, p. 3). The "affidavit" contains narrative facts that mirror the information in the letter. (Doc. 74-36, pp. 3-5). The affidavit has only an electronic signature, (Doc. 74-36, p. 3), and the affidavit is not notarized. (Doc. 74-36, p. 6).

Ms. Lane did not identify Ms. Hetrick as a potential witness in this case. Neither Ms. Lane nor the Secretary identified Ms. Hetrick in Rule 26 disclosures. (Doc. 79-1; Doc. 79-2). Ms. Lane briefly mentioned Ms. Hetrick during discovery.

Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure requires a party to provide to the other parties "the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses," and "a copy—or a description by category and location—of all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i)-(ii). Rule 26(e)(1)(A) requires a party to supplement its initial Rule 26 disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Pursuant to Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless."

Ms. Lane has not attempted to show how the failure to identify Ms. Hetrick was "substantially justified." Instead, she argues that the failure is harmless because the Secretary should have known that she would rely on Ms. Hetrick because of a line of questioning in Ms. Hickox's deposition. (Doc. 81, p. 3). Ms. Lane's argument rests on the following excerpt from Ms. Hickox's deposition:

Q.    Do you recall a person by the name of Kara Hetrick?

A.    Yes. She used to work for me.

Q.    Do you recall her requesting to be off work and not submitting the approved forms that you're talking about in advance of being off work?

Mr. Saxon: Object to the form.

A.    No, I don't. I mean, I've had 40, 50 employees since this.

Q.    And if she were to say that was routine or customary within the office that you supervised; that persons would request leave, be approved, and fill out the paperwork afterwards, and she was saying that, would you agree with that or not?

Mr. Saxon: Object to the form.

A.    The policy is as stated here. When you request annual leave in advance, you submit your form before you leave. And specifically, Linda stood at my desk, and I asked her the question. She said -- I said, Linda, if you're still planning on going to see your father, you need to fill out a leave form.

Q.    Right. And what I'm asking you about is particularly Kara Hetrick and other employees who may have requested annual leave, didn't fill out the forms that you suggest are required, and then did it after the fact.

Do you recall those instances?

A.     I don't recall any.   It might have been an emergency that somebody had, like, a flat tire or car wreck or something like that.

(Doc. 74-4, pp. 4-5).  Ms. Lane argues that "[b]ased on this line of questioning in Hickox's deposition, [the Secretary] was certainly aware that [Ms. Lane] intended to rely on Hetrick's testimony.   In fact, the above quoted line of questioning specifically mirrors Hetrick's statements which [the Secretary] seeks to strike." (Doc. 81, p. 5).

If the questions during Ms. Hickox's deposition were sufficient to notify the Secretary that Ms. Hetrick might be a witness in this case so as to satisfy Rule 37(c)(1)'s harmless standard (an issue that the Court does not decide), the unsworn letter and affidavit are not sufficient to constitute summary judgment evidence. Giving Ms. Lane every benefit of the doubt, if the Court were to read the letter and the "affidavit" together and treat them in combination as a declaration, the information in the purported declaration would not be admissible because neither the letter nor the "affidavit" indicates that Ms. Hetrick provides the information in those documents "under penalty of perjury."  28 U.S.C. § 1746.  Therefore, Ms. Lane may not rely on the unsworn information.  *See generally Nawab v. Unifund CCR Partners*, 553 Fed. Appx. 856, 861-62 (11th Cir. 2013) (citing *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980), and stating that litigants may not use unsworn

materials to oppose a motion for summary judgment).[4]

Accordingly, the Court sustains the Secretary's objection and disregards Doc. 74-36 for purposes of resolving the Secretary's motion for summary judgment.

**Discrimination and Retaliation**

1.     Disability Discrimination Under § 504 of the Rehabilitation Act

Ms. Lane asserts her disability discrimination claim against the Secretary of Defense under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  (Doc. 51, p. 12-13 ¶ 86-91).  Section 504 provides that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  The Secretary contends that Ms. Lane is not entitled to a jury trial or compensatory damages for her Rehabilitation Act claim.  (Doc. 69, p. 64).  The Court agrees.

Absent waiver, sovereign immunity shields agencies of the federal government from claims for damages.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Waiver must be unequivocally expressed in statutory text and will not be implied.

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*United States v. Nordic Village, Inc.,* 503 U.S. 30, 33–34, 37 (1992). A statute's legislative history may not supply a waiver that is not unequivocally expressed in the statutory text. *Nordic Village,* 503 U.S. at 37. When confronted with a purported waiver of sovereign immunity, ambiguities must be construed in favor of immunity. *United States v. Williams,* 514 U.S. 527, 531 (1995).

There is no such unequivocal waiver of sovereign immunity under § 504 of the Rehabilitation Act. Section 505(a)(2) of the Rehabilitation Act states that: "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [§ 504]." 29 U.S.C. § 794a(a)(2). Although a Title VI plaintiff may recover monetary damages, the United States Supreme Court has held that the reference in § 505(a)(2) to the remedies available under Title VI does not constitute an unequivocal waiver of sovereign immunity. *Lane v. Pena*, 518 U.S. 187, 191 (1996). The Supreme Court stated: "[t]he clarity of expression necessary to establish a waiver of the Government's sovereign immunity against monetary damages for violations of § 504 is lacking in the text of the relevant provisions." 518 U.S. at 192.

Ms. Lane argues that she should be entitled to a jury trial and compensatory damages under *Liese v. Indian River County Hospital District*, 701 F.3d 334, 342 (11th Cir. 2012). The defendant in that case was a county hospital, not an executive

agency of the federal government.  Here, the parties agree that the Department of Defense is a "United States Federal entity."  (Doc. 48, p. 2).  As such, Ms. Lane may not recover damages from the Secretary for her disability discrimination claim under § 504 of the Rehabilitation Act.  Therefore, the Court enters judgment in favor of the Secretary with respect to Ms. Lane's claim for damages (compensatory and punitive) under § 504 of the Rehabilitation Act.

The Court has questions concerning Ms. Lane's § 504 claim as it pertains to her requests for declaratory and injunctive relief and her request for reinstatement. The Court will set a telephone conference to discuss this aspect of Ms. Lane's claim under the Rehabilitation Act.

2.    Retaliation Under Title VII

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]."  42 U.S.C. § 2000e-3(a).  A plaintiff may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), to establish a retaliation claim.  *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016) (citations omitted).  "To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment

action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). "Only after the plaintiff makes this prima facie case of discriminatory retaliation does the burden shift to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).

Here, it is undisputed that Ms. Lane engaged in protected expression by filing her first EEO complaint, and she suffered adverse employment actions with respect to her 14-day suspension and her removal from federal service.[5] Ms. Lane's retaliation claim falls short with respect to the causal relation prong of her prima facie case.

The evidence in the record indicates that Ms. Hickox and others discussed taking action against Ms. Lane well before Ms. Lane filed her first EEO action. In an email dated September 10, 2012, Ms. Hickox wrote that although Ms. Lane had performed satisfactorily for one year, "it seems she is starting a downhill slide, and I can't figure it out. There is a concern that she is unstable, and I would agree with that, though I am not a therapist . . . I think this needs to be documented with DOH

---

[5] Ms. Lane also suffered a three-day suspension in October 2013.

too." (Doc. 74-35, p. 1). Ms. Lane attests that before a meeting in November 2012 to discuss her request for accommodations, Ms. Hickox "encouraged [Ms. Lane] to leave MDA." (Doc. 74-12, p. 2). Ms. Lane asserts that Duane Keller witnessed Ms. Hickox's remark. (Doc. 74-12, p. 2). In December 2012, Ms. Hickox reported a "new incident with Linda Lane" and stated that "Linda's issues are spreading to the program office." (Doc. 74-34). Ms. Hickox asked MDA to consider moving Ms. Lane to another office because "if Linda faces any type of conflict in the office, we'll continually be addressing it as an EEO complaint." (Doc. 74-34). More than a year earlier, on October 4, 2011, Ms. Thornton's predecessor, Barney Klehman, copied Ms. Hickox on an email in which Mr. Klehman stated:

> We need a meeting with DOH and GC to determine a path ahead. Either [Ms. Lane] is mentally ill (which I think is a definite possibility), or she is trying to manipulate the system. . . . We need to start the official documentation trail; at this point there is no longer any reason to try to help this employee, and we need to be prepared for a long and arduous process leading to separation.

(Doc. 74-49, p. 1).

In *Drago*, the Eleventh Circuit Court of Appeals held that "in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago*, 453 F.3d at 1308. Mr. Drago could not "present a jury question

regarding causation because the record evidence [was] so overwhelming" that his employer "contemplated demoting him before he ever complained that [his employer] was interfering with his FMLA rights." 453 F.3d at 1308. The record demonstrated that months before Mr. Drago took FMLA leave, his employer "considered demoting Drago for performance-related reasons." 453 F.3d at 1308.

The same is true here. Pre-EEO complaint, the reasons stated for moving Ms. Lane to another department or terminating her federal service seem to concern both performance and mental health issues, but at bottom, well before Ms. Lane filed her first EEO complaint, Ms. Hickox and Ms. Lane's other supervisors were engaged in efforts to remove her from her position as a contracting specialist for MDA. Under *Drago* then, Ms. Lane cannot establish the causation element of her prima facie case of retaliation. Therefore, the Court will enter judgment for the Secretary on Ms. Lane's Title VII retaliation claim.

## IV. CONCLUSION

For the reasons discussed above, the Court enters judgment in favor of the Secretary with respect to Ms. Lane's claim for damages (compensatory and punitive) under § 504 of the Rehabilitation Act and with respect to Ms. Lane's Title VII retaliation claim. The Court sets this matter for a telephone conference at 1:30 on October 1, 2019. By separate order, the Court will provide call information.

**DONE** and **ORDERED** this September 30, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE